# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | |
|---|---|
| UNITED STATES | CIVIL ACTION NO. 70-15632 |
| VERSUS | JUDGE ROBERT G. JAMES |
| FRANKLIN PARISH SCHOOL BOARD | MAG. JUDGE KAREN L. HAYES |

## RULING

Pending before the Court is a Motion for Declaration of Unitary Status and to Dismiss [Doc. No. 57] filed by Defendant Franklin Parish School Board ("School Board"). For the following reasons, the motion is GRANTED.

## I.    FACTS AND PROCEDURAL HISTORY

The United States of America originally brought this desegregation action on May 1, 1970. On August 20, 1970, the Court permanently enjoined the School Board from discrimination on the basis of race in the operation of the District and approved a school desegregation plan prepared by the United States, which was designed to remove the vestiges of racial discrimination under the dual school system that had previously been in place. The plan contained the following provisions:

(1)    Assigning students to schools based on their grade level and ward lines;

(2)    Desegregating faculty and other staff and employing on a non-discriminatory basis;

(3)    Allowing students in the majority race to transfer to a school where they would be in the minority race, giving priority to these transferring students, and providing transportation to these students, if desired;

(4)     Requiring a regular examination of the transportation system of the school district and providing transportation on a non-segregated and non-discriminatory basis;

(5)     Requiring that all school construction, school consolidation, and site selection be done in a manner which would prevent the recurrence of the dual school structure and promote desegregation of the school system;

(6)     Allowing transfers on a non-discriminatory basis, but forbidding transfers where the effect would be reducing desegregation or reinforcing the dual school system;

(7)     Prohibiting the maintenance of any classroom, non-classroom, or extracurricular activity on a segregated basis;

(8)     Creating a bi-racial committee to serve as an advisory board to the school board;

(9)     Requiring biannual reporting.

The August 20, 1970 order was modified on October 15, 1974, to allow the School Board to close Central School and reassign the students from Central School to Crowville and Baskin High Schools.  The faculty were reassigned to other schools in the system.

The plan was next modified on June 18, 1982, to implement objective criteria for the demotion and dismissal of professional personnel.

On July 11, 1983, the plan was modified to permit the School Board to close Wisner Junior High School on or before the beginning of the 1983-84 school year, provided that Northeast Louisiana University operate a branch on the Wisner Junior High School campus.

A consent order was entered into by the parties on December 8, 1995, and approved by the Court.  The parties agreed that a plan to establish three high schools would be implemented in the 1997-98 school year.  The consent order also required the School Board to engage in recruitment of minority personnel.  The consent order further required the School Board to perform an impact study at least 90 days prior to  purchasing to or entering a binding agreement

2

to purchase property, performing construction, or abandoning any facility.  Last, the consent order contained a modified reporting requirement.

A second consent decree was adopted by the parties and approved by the Court on January 10, 1997.  This consent decree declared that facility disparity and school assignment vestiges existed at the schools located in the 1996-97 and 1997-98 Winnsboro and Wisner elementary and middle school zones.  To remedy these vestiges, the consent decree set forth attendance zones for the 1997-98 school year, and the School Board agreed to submit a comprehensive plan to achieve desegregation of the elementary and middle schools in the area.

Next, the Court approved another consent order on July 22, 1998.  This consent order modified attendance zones and discussed the possibility of implementing a magnet program at Winnsboro Lower, Winnsboro Upper, and Winnsboro Junior High schools.  The consent order also modified transfer requirements and declared that African-American students who resided in the zone for the Ward III school would be allowed to register for the Ward III school or the Baskin school.  The consent order called for the recruitment of qualified minority personnel and allowed the renovation and refurbishment of the Winnsboro facilities.  Last, the consent order set forth reporting requirements to be fulfilled by the School Board.

On May 5, 1999, the Court approved another consent decree submitted by the parties. The consent decree granted the appointment of two women to administrative positions within the school system and established record-keeping guidelines for the promotion or selection of persons to administrative positions.  The consent decree also discussed when a transfer request based on medical reasons would be approved.

Further modifications were made to the original desegregation decree on June 14, 2000,

3

when the Court authorized the closure of Wisner High School, with all students to be reassigned to Winnsboro High School.

On August 4, 2002, the Court granted the School Board's motion to move the third and fourth grades from Gilbert Junior High School to Wisner Elementary School.

The decree was further modified on August 9, 2003, when the Court approved a motion to close Ogden Primary School and reassign those students to Winnsboro Elementary School. The order also authorized the School Board to move the fifth grade at Winnsboro Elementary School to Winnsboro Junior High School.

On February 26, 2004, the Court granted a motion to amend the School Board transfer policy to comply with the No Child Left Behind Act.

A school consolidation plan, approved by the Court on May 24, 2004, further modified the decree.  The school consolidation called for the closure of all schools except the following: Winnsboro High School (grades 9-12) (which became Franklin Parish High School), Gilbert School (grades PK-8), Crowville School (grades PK-8), Baskin School (grades PK-8), and Winnsboro Elementary School (grades PK-5).

On August 18, 2004, the Court permitted a modification to the May 24, 2004, consolidation plan, allowing Fort Necessity Junior High School to remain open for one additional year.

On August 30, 2005, the Court approved a change in school assignment zones.

During the pendency of the action, the School Board has filed regular bi-annual reports in compliance with the Court's orders, providing information on student assignment; teacher recruiting, employment and assignment; extracurricular activities; and facilities

4

expenditures.  The United States Department of Justice ("DOJ") has never filed any objections to the School Board's reports, moved for further relief challenging the School Board's desegregation efforts or the results of the implementation of the desegregation plan, or contested any motions for modification.

In  2009, the DOJ, at the Court's direction and with the cooperation of the School Board, began a comprehensive review of the School Board's compliance with its obligations under the operative court orders in this case.  The review, which was conducted over nearly three years, included analysis of the School Board's annual reports and  responses to the DOJ's multiple requests for information, as well as a site visit to the District's schools by the DOJ's counsel.

At no time during this period of review did the DOJ file any objections, file a motion for further relief, or suggest any remedial measures to further desegregation in the District.

On March 1, 2013, the School Board filed its Motion for Declaration of Unitary Status and to Dismiss [Doc. No. 57].  On March 22,  2013, the DOJ filed an opposition [Doc. No. 59]. On April 22, 2013, the School Board filed a Reply [Doc. No. 61].

On May 13 and 14, 2013, the Court conducted a hearing on the School Board's Motion. The School Board presented seven (7) witnesses, including the Superintendent, the Franklin Parish High School Principal, and five (5) central office administrators charged with duties directly related to the relevant desegregation issues. The School Board also introduced ten (10) exhibits.  The DOJ cross-examined the School Board's witnesses, but did not present any of its own witnesses or exhibits.

Following the hearing, the School Board filed proposed findings of fact and conclusions of law [Doc. No. 70], and the DOJ filed a responsive brief [Doc. No. 71].  The School Board

5

filed a reply brief [Doc. No. 72].  The DOJ does not stipulate to the entry of unitary status as to any of the six *Green* factors.  *See Green v. Cnty. Sch. Bd. of New Kent Cnty.*, *Va*., 391 U.S. 430 (1968).  However, the DOJ only contests the District's unitary status as to the *Green* factors of student assignment, transportation, and teacher assignment.  The DOJ further contests entry of unitary status based on the failure of the School Board to maintain a committee of community members, as provided for in the August 20, 1970 Order.

## II.    LAW AND ANALYSIS

### A.    Desegregation Law

When first presented with a school desegregation case, a district court is charged with determining whether or not a school board has maintained or facilitated a dual school system in violation of the Equal Protection Clause of the United States Constitution.  U.S. CONST., Amend. XIV.  If the district court finds such a violation, then under *Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1954), and *Brown v. Bd. of Educ.*, 349 U.S. 294 (1955), the dual system must be dismantled, and the school board must "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green*, 391 U.S. at 437-38.

Neither a school board's nor a district court's duty ends with the initial desegregation order.  Rather, there is a "continuing duty [for school officials] to eliminate the system-wide effects of earlier discrimination and to create a unitary school system untainted by the past." *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 225 (5th Cir. 1983) (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)).  Likewise, the district court "retain[s] jurisdiction until it is clear that state-imposed segregation has been completely

removed." *Id.* (citing *Green*, 391 U.S. at 439; *Raney v. Bd. of Educ.*, 391 U.S. 443, 449 (1968)).

The goal of the district court is to return "schools to the control of local authorities at the earliest practicable date." *Freeman v. Pitts*, 503 U.S. 467, 490 (1992).  In discharging this duty, the district court considers the Supreme Court's "*Green* factors":  (1) faculty and staff assignments; (2) transportation; (3) extra-curricular activities; (4) facilities; and (5) student assignments.  *Green*, 391 U.S. at 435; *see also Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 250 (1991).

"The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable."  *Dowell*, 498 at  249-50; *Freeman*, 503 U.S. at 491; *Green*, 391 U.S. at 439; *Ross*, 699 F.2d at 225.  To meet its obligation, "[f]or at least three years, the school board must report to the district court." *Monteilh v. St. Landry Parish Sch. Bd.*, 848 F.2d 625, 629 (5th Cir. 1988).  Further, "the district in question must have for several years operated as a unitary system." *Lemon v. Bossier Parish Sch. Bd.*, 444 F.2d 1400, 1401 (5th Cir. 1971). The Court may declare a subject unitary if it determines that the school board has not engaged in any continued racial discrimination and has acted in good faith to maintain its non-discriminatory practices.  *See Freeman*, 503 U.S. at 490-91; *see also Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991) (We use the term "unitary" to refer to a school district that "has done all that it could to remedy the [prior] segregation caused by official action.") .

**B.     The *Green* Factors**

    **1.     Extra-curricular activities**

The 1970 Decree provides that the School Board is prohibited from maintaining "any classroom, non-classroom, or extracurricular activity on a segregated basis[.]"

The School Board provides students with a variety of extracurricular opportunities at all the schools in the District.  All students are given an opportunity to participate in whatever extracurricular activity they chose.  All students are free to participate in or try out for any activity on a completely voluntary basis and without any racial barriers or other requirements set by the District.  The District has received no complaints regarding access to extracurricular activities.

Sponsors and coaches for all extracurricular activities are assigned in a nondiscriminatory manner, according to considerations unrelated to race.[1]

Based on the testimony and evidence received at the hearing, the Court finds that the School Board has maintained a nondiscriminatory program of  extracurricular activities for more than the prior three years.  Therefore, the District is unitary in the area of extracurricular activities.

    **2.     Facilities**

The 1970 Decree requires that "all school construction, school consolidation, and site selection be done in a manner which would prevent the recurrence of the dual school structure and promote desegregation of the school system[.]"

As of the 2012-13 school year, the School Board operates the following schools:  (1) the

---

[1]Sartin Testimony, Tr. I at p. 151/22-25, p. 152/1-11.

only high school (grades 9-12) - Franklin Parish High School; (2) four preK-8 schools - Baskin School, Crowville School, Gilbert Junior High School, and Fort Necessity School; (3) one preK-5 school - Winnsboro Elementary School; and (4) one alternative school that serves a variety of grades, as needed - H.G. White Learning Center.  Each of the schools is each located on an individual campus site and situated within the court-approved attendance zones throughout the Parish.

The school facilities on each campus, while differing in age, style and construction, provide reasonably similar accommodations for student and educational needs, regardless of the racial demographics of the students at each school.

The schools each have comparable libraries with comparable volumes and equipment.

The School Board provides the same or similar technology, such as smart-boards and computers, for each of the schools.  Every school must comply with the same procedures for acquisition and repair of equipment via procedures which are implemented in the same way for each school.  The District has received no complaints regarding the comparability of technology in the schools or the repair,  maintenance, or acquisition of  equipment.

The school facilities are maintained in the same manner, and the schools all follow the same procedures for requesting maintenance.  The District has received no complaints regarding the equality of renovations or maintenance of facilities.

The School Board has expended an equitable amount of funds on each school facility for maintenance,  renovations, and technology.

Based on the testimony and evidence received at the hearing, the Court finds that the School Board has maintained and operated its school facilities consistent with the Decree and

with the goals of desegregation for more than the prior three years.  Therefore, the District is declared unitary in the area of facilities.

###   3.   Staff Assignments

The 1970 Decree provides for the desegregation of faculty "and other staff" and for employment of faculty and staff "on a non-discriminatory basis."

The School Board has adopted and implemented a policy of Equal Opportunity Employment which demonstrates a commitment to nondiscriminatory employment practices.

Over the past three years, the District has maintained the following administrative staff assignment in its schools: Principals 2/28.6% black and 5/71.4% white; Assistant Principals 2/28.6% black and 5/71.4% white.  These administrators are not assigned according to the race of the employee or of the students at the assigned school.  For example, a white principal is assigned to predominately black Winnsboro Elementary School, and a black principal is assigned to majority white Gilbert Junior High School.  Further, the currently assigned black principals and assistant principals are the only black employees in the District who are certified for these administrative positions.

Of the certified staff members currently assigned to the School Board's Central Office, six are black and fourteen are white, a ratio which is commensurate with the racial percentages of teachers District-wide.  Of the non-certified staff members currently assigned to the Central Office, nine are black and fifteen are white, a ratio which is also commensurate with the teacher ratio.

Based on the testimony and evidence received at the hearing, the Court finds that the School Board has assigned its staff in a non-discriminatory manner, consistent with the Decree,

10

for more than the prior three years.  Therefore, the District is unitary in the area of staff assignments.

### 4.        Teacher/Faculty Assignments

The 1970 Decree's provision on staff assignments also applies to teacher or faculty assignments.

The School Board has adopted and implemented a policy of Equal Opportunity Employment policy, which demonstrates a commitment to nondiscriminatory employment practices.

The District maintains an active recruitment schedule that includes minority-focused recruiting, such as annual attendance at job fairs at historically black universities and other general efforts such as on-line advertisements and networking.  Unfortunately, it has been consistently demonstrated to the Court in this and other desegregation cases that recruiting of minority teachers is difficult because the graduation rate of teachers (of any race) and the number of black education majors in particular have greatly decreased.  Additionally, the School Board's recruiting efforts are hampered by the availability of jobs in nearby districts with a considerably higher pay-scale.

As of the 2012-13 school year, the School Board employed 213 teachers with a racial make-up of 18% black, 80%  white, and 2% other races.  Over the past three  years, the diversity of teachers at each school has been fairly consistent, with four of the seven schools (Baskin, Fort Necessity, Gilbert, and Franklin Parish High School) regularly falling within the standard +/- 10% of the District-wide teacher  racial ratio.  The assignment of teachers at three schools–Winnsboro Elementary, Crowville, and H.G. White Learning Center–were not in

compliance within 10% of the District-wide ratios for black teachers.[2]

Winnsboro Elementary School has a predominantly black teaching faculty, but its faculty is actually the most diverse in the District.  The School Board has also taken steps in the past to recruit more white teachers to the school.  At one time, the School Board offered a signing bonus to transferring white teachers, but the bonus attracted only two white teachers who did not stay at the school long term.  Because of the minimal success, the School Board discontinued the bonus program.

The testimony indicated that Crowville is located in a rural and predominantly black area of the District.

The H.G. White Learning Center is an alternative school for children who have been removed from their regularly assigned schools for disciplinary reasons.

The DOJ has argued that the District is not unitary and could take other steps to achieve the goals of desegregation.  Specifically, the DOJ cites testimony of the Superintendent that all new hires of a particular race could be assigned to schools in an effort to bring greater racial balance.  The Personnel Supervisor testified, however, that the District tries to accommodate the requests of teachers for assignment to particular schools if possible.

The Court shares the DOJ's concerns, but there is no evidence to suggest that any teachers are assigned to Winnsboro or any other District school for a discriminatory purpose.  The main reasons for assigning teachers are teacher requests based on proximity of their residence to the school and teacher preferences to teach at "a disadvantaged school."  Additionally, the Court recognizes the continuing struggle of rural school districts to attract and

---

[2] The 10% ratio was set forth in the Court's July 22, 1998 Order.

retain qualified teachers. The School Board's concern that assignment (or reassignment) of teachers would create a realistic risk of losing the teachers to higher paying districts is valid, in the opinion of the Court and based on the years supervising this and other desegregation cases.

While the Court, like the DOJ, would have greater satisfaction if the remaining three schools were within the +/- 10% standard, that was a standard agreed to by the parties in a consent order fifteen years ago. The law itself does not require such strict compliance, and requiring the School Board to meet this standard now ignores the economic reality of the District's finances and the shortage of teachers generally and black teachers specifically. Finally, there is no evidence that the current assignment of teachers is a result of the prior dual system or a vestige of past discrimination.

Based on the evidence and testimony presented at the hearing, the Court finds that the School Board has effectively eradicated any vestige of past discrimination with regard to teacher assignments and has consistently maintained and implemented such non-discriminatory policies and practices for many more than the requisite three years necessary to demonstrate it has attained unitary status in that area of operation. Therefore, the District is declared unitary in the area of teacher assignments.

### 5. Transportation

With regard to transportation, the 1970 Decree provides as follows:

> Requiring a regular examination of the transportation system of the
> school district and providing transportation on a non-segregated
> and non-discriminatory basis[.]

There are no rigid guidelines exist by which to gauge unitary status with regard to transportation. *Swann*, 402 U.S. at 22-31. District courts must weigh the soundness of any transportation plan in

light of general desegregation concerns.  However, those concerns, including the desire to eliminate one-race or majority one-race routes, must be balanced against the need to avoid routes that result in travel times or distances that are "so great as to either risk the health of the children or significantly impinge on the educational process."  *Id.* at 30-31.  The Supreme Court has cautioned that "the limits on time of travel will vary with many factors, but probably with none more than the age of the students."  *Id.* at 31.

The evidence demonstrates that the School Board has a non-discriminatory transportation plan which provides bus transportation to and from school to all eligible students enrolled in the District by routes that are devised based on geographical and economical concerns, not the race of the students.  Of the fifty-eight routes, there are approximately ten routes which are one-race or predominately one-race routes.

The Transportation Supervisor testified that he had not read the entire desegregation order, and the Superintendent admitted that there was no planning document for school operations.  The Transportation Supervisor further testified that he had not studied whether routes could be planned to eliminate or reduce the number of one-race and predominantly one-race routes.  However, the map routes were available at the hearing, and no testimony or evidence was provided to the Court to show that there were feasible alternatives to the current routes.

The testimony and evidence were clear that the routes were not based on race.  One-race and predominantly one-race routes exist as a result of residential housing patterns and, to some extent, the economic concerns of the District.  Ultimately, the testimony and evidence show that the School Board's focus is on its ability to safely transport students in the most efficient manner,

saving the students time on the bus and the District money spent on fuel costs.

Based on these facts, the Court finds that the School Board has operated and continues to operate its system-wide transportation program in a unitary manner, with no vestige of past discrimination remaining in that area of operation. It has adhered to its non-discriminatory policies and practices for many more than the requisite three years necessary to demonstrate it has attained unitary status in that area of operation. Therefore, the District is declared unitary in the area of transportation.

### 6.     Student Assignments

The 1970 Decree has three provisions affecting student assignment: (1) students are to be assigned "to schools based on their grade level and ward lines;" (2) students in the majority race are to be allowed "to transfer to a school where they would be in the minority race, giving priority to these transferring students, and providing transportation to these students, if desired;" and (3) all other student transfers are to be "on a non-discriminatory basis," and any transfers which would have the effect of "reducing desegregation or reinforcing the dual school system" are forbidden.

In this case, the School Board has implemented lawful, non-discriminatory student assignment policies which assign students to schools according to grade level and place of physical residence or otherwise with approved transfers. This assignment plan has resulted in one school remaining racially identifiable and only two being slightly outside the standard 15% +/- range.

The law does not require that all schools in a district be racially balanced as a prerequisite to a unitary status finding. *See Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 298 (5th

Cir. 2008).  As the Fifth Circuit has explained,

> [t]he constitution does not require school districts to achieve maximum desegregation; that the plan does not result in the most desegregation possible does not mean that the plan is flawed constitutionally.  The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.  The school board's constitutional duty is to cure the continuing effects of the dual system, not to achieve an ideal racial balance.

*Monteilh v. St. Landry Parish Sch. Bd.*, 848 F.2d 625, 632 (5th Cir. 1988) (internal quotations and citations omitted).  The Court need not employ "'awkward,' 'inconvenient,' or 'even bizarre' measures . . . to achieve racially balanced school assignments 'in the late phases of carrying out a decree, when the imbalance is attributable neither to the prior *de jure* system nor to a later violation by the school district but rather to independent demographic forces.'"  *Hull v. Quitman Cnty. Bd. Of Educ.*, 1 F.3d 1450, 1454 (5th Cir. 1993) (quoting *Freeman*, 503 U.S. at 493).  A school board's affirmative duty does not compel it to adopt the most desegregative student assignment alternative available, but to act in good faith within the practical limitations.  *Swann*, 402 U.S. at 18 (citation omitted).

Several principles can guide the Court to determine whether current racial imbalance is a product of prior discrimination.  Schools that were previously segregated white but now enroll a predominantly black student body cannot be considered to be a vestige of prior *de jure* segregation.  *Freeman*, 503 U.S. at 478, 495.  Furthermore, schools previously brought into racial balance by remedial efforts but which have since fallen out of balance as a result of private choices (including changes in demographics) similarly cannot constitute a vestige of prior *de jure* segregation.  *Id.*; *N.A.A.C.P., Jacksonville Branch v. Duval Cnty. Sch.* 273 F.3d 960, 969-73 (11th Cir. 2001); *Belk*, 269 F.3d at 395-96.  Logic follows that a school opened under the Court's

supervision and with the Court's approval cannot be considered to be a vestige of prior *de jure* segregation.

Finally, the Supreme Court has recognized the familiar phenomenon that in metropolitan areas minority groups are often found concentrated in one part of the city and that, in some circumstances, certain schools may remain all or largely of one race until neighborhood patterns change. *Swann*, 402 U.S. at 26.

Currently, both Franklin Parish High School and the H.G. White Learning Center (the alternative school) serve the entire District.  Of the remaining schools, Winnsboro Elementary serves grades preK-5 in the town of Winnsboro, Baskin School serves grades preK-8 in the northwest part of the District, Crowville School serves grades pre-K-8 in the northeast part of the District, Gilbert School serves grades pre-K-8 in the southeast part of the District, and Fort Necessity School serves grades preK-8 in the southwest part of the District.

Winnsboro Elementary School is located in the town of Winnsboro, which has a predominately black population, while Crowville and Fort Necessity are located in more rural areas, which have predominately white populations.  No evidence was presented to show that Winnsboro became racially identifiable or that Crowville or Fort Necessity has majority white enrollment for any reason other than the residential housing choices and the choices of parents to send their children to private versus public schools.  Because racial imbalance arising from such choices is not, as a matter of law, a vestige of discrimination, no constitutional violation arises due to the existence of this predominately one-race school or the two schools which are outside the standard 15%+/- deviation.

Nevertheless, the law requires that the School Board take all practicable steps to eliminate

17

the vestiges of the dual system.  Thus, the Court has considered the actions taken by the School
Board with regard to student assignment and whether the School Board should be required to
take further action.  First, the School Board has already consolidated its high schools, so that all
students attend a single, fully desegregated high school.   Second, the Court previously approved
the School Board's plan to reorganize grades 6-8, so that the predominately black student body
from Winnsboro Elementary School matriculates to Crowville and Fort Necessity Schools for
grades 6-8, and all students return to Winnsboro for high school grades 9-12.   Third, consistent
with the 1970 Decree, the District has implemented a successful majority-to-minority transfer
policy, allowing students in the majority racial group of their home school to transfer to a school
where they will be in the minority. An optional majority-to-minority transfer provision has long
been recognized as a useful part of every desegregation plan, where, as here, students are
provided with free transportation.

There is no evidence before the Court to suggest that there exists another practical
measure to further desegregate the elementary schools here.  Indeed, the District's expressed
concern about transporting young students (grades preK-5) (i.e., the long routes that would be the
result of further reassignment of the elementary school students) is a valid objection.[3]  In 2005,
the School Board, with this Court's approval, reasonably sought to achieve greater desegregation
while addressing this concern by restructuring grade levels and creating one high school for the
entire District.  As the School Board notes, this restructuring burden black students who must
travel from Winnsboro to the more rural white areas for three years during grades 6-8, but
requires white students to travel from the Crowville, Fort Necessity, Baskin, and Gilbert areas to

--------

[3]This concern is consistent with the Supreme Court's analysis of the transportation factor.

Winnsboro for four years of high school.  Under these facts, the School Board has taken reasonable and practical steps to further desegregate the District, and no further intervention of the Court is required in student assignment to particular schools.

The Court has also considered the assignment of students to individual classes within a school.  Previously, the DOJ questioned the greater number of white students enrolled in the honors classes offered at Franklin Parish High School, but the evidence presented at the hearing shows that parents were made aware of these classes, and students were admitted to the classes based on ability and achievement.  No data was introduced to show the racial ratio of any honors or dual enrollment class.  There simply was  no evidence presented to suggest  that the School Board has created separate classes -whether honors or otherwise - for blacks and whites. Because these honors classes are open to all  students who choose to take the course, the fact that more white students than black are enrolled cannot be attributed to racial discrimination. Therefore, the Court finds that the School Board's assignment of students to honors classes does not indicate racial animus or result from some vestige of discrimination.

Finally, though student discipline is not one of the six (6) *Green* factors, courts have treated student discipline as an ancillary factor when discrimination is alleged.  The DOJ cited statistics in support of its pre-hearing brief showing that disciplinary action against blacks was disproportionate to the District-wide racial enrollment.  The DOJ raises concerns that the Superintendent was aware of the disproportionate number of black students assigned to the H.G. White Learning Center, did not suggest steps that could be taken to address this issue.

However, the DOJ presented no evidence that the disproportionate number of black students subjected to discipline or who were assigned to the H.G. White Learning Center were

attributable to the discriminatory or improper actions of the School Board or its employees.

The evidence here was conclusive that the District has provided notice, training, and implementation of the District's discipline plan, which includes the successful PBIS program.   There is no evidence that the School Board's disciplinary policies are discriminatory or that the policies were implemented in a discriminatory fashion.  Therefore, student discipline in the District comports with the District's constitutional duty of nondiscrimination and its disciplinary practices cannot be viewed as a vestige of the former *de jure* system.

The Court finds that the School Board has effectively eradicated any vestige of past discrimination in the area of student assignment and has maintained such nondiscriminatory policies and practices for many more than the requisite three years necessary to demonstrate it has attained unitary status in that area of operation.  Therefore, the District is declared unitary in the area of student assignment.

### C.    **Non-*Green* Factor**

In addition to the *Green* factors, the DOJ argues that the District should not be declared unitary because of its failure to maintain a community committee, as required by the 1970 Decree.  The Decree provides that the School Board will create "a bi-racial committee to serve as an advisory board to the school board[.]"

The Superintendent testified that he did not believe a bi-racial committee was mandated (although he had worked with such a committee in the past in other Districts) and that no such committee has existed during his tenure.  However, the Superintendent also testified that he had received no complaints of racial discrimination.

Moreover, no party has inquired about a bi-racial committee during the years that this

20

Court has supervised the School Board.  The School Board itself now has two black members, and there are both white and black administrators employed by the School Board.

Under these circumstances, the Court finds that the goal of a bi-racial committee to "discuss[] ways and means of achieving inter-racial harmony and understanding among the students, teachers, and patrons" has been met in other ways.

### D.      Good Faith

The Court's findings above with regard to the *Green* factors constitute outward signs of the School Board's commitment to its students, employees, the public, and to this Court that it has, in good faith, erased all traces of prior discrimination.  Having fully reviewed and considered the record evidence and the additional evidence and testimony presented at the hearing, the Court finds that the School Board has demonstrated its good faith commitment to the entirety of the desegregation plan, so that the students, parents, and public have assurance that further injuries or stigma will not occur.

## II.    CONCLUSION

For the foregoing reasons, the School Board's motion [Doc. No. 57] is GRANTED, the District is DECLARED unitary as to all areas of operation, and the permanent injunction previously entered is DISSOLVED.  This matter is DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 6th day of August, 2013.


**ROBERT G. JAMES**
**UNITED STATES DISTRICT JUDGE**